H. D. YORK, Administator of the Estate of JOHN GRAHAM, Appellant, v. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

**Contributory Negligence of Engineer:** ᴠRULES: *Court and jury.* The rules of a railroad, with which an engineer was familiar, provided that the conductor controlled the movements of the train, "except when his directions conflict with these rules or involve risk or hazard, in which cases the engineer will be held alike accountable." Also, "no train shall assume the rights of another without orders." An engineer knew or should have known that a train coming from the opposite direction would, if running on time and according to rules, collide with him before he could make the next station, and he had no right to assume that it was not so running. He also knew that the conductor had no orders allowing a run on the time of the coming train. Notwithstanding, and without the existence of any emergency, he obeyed the conductor's signal to start. He was injured in the collision that ensued. *Held*, he was guilty of contributory negligence, as matter of law. *Hass v. Ry.,* 90 Iowa, 259, *distinguished.*

EMPLOYMENT OF PHYSICIAN BY RAILROAD. A railroad company is not liable for any negligence of its surgeon, employed by it to gratuitously treat its injured employes, in causing an injured

NOTE.--For note as to reliance upon orders as affecting contributory negligence of an employe, see *Orman v. Mannix,* 17 L. R. A. (Col.) 602.

employe to be moved from one place to another, where it was not
negligence to employ him.

*Appeal from Jones District Court.*—Hon. W. P. Wolf,
Judge.

Monday, May 25, 1896.

This is an action to recover damages for the death
of John Graham, an engineer, who was fatally injured
by a collision of two freight trains on the defendant's
railway, between Anamosa and Stone City, Iowa, on
January 27, 1893. The case was tried to a jury, and,
at the close of the evidence, the court, on motion of
defendant's counsel, directed a verdict for it, which
was rendered accordingly, and a judgment entered
thereon, from which this appeal is prosecuted.

To a proper understanding of the case, a full state-
ment of the facts is necessary.

On the day of the accident, and for several months
prior thereto, the decedent, Graham, had been acting
as an engineer on the defendant's line of railway
between Jackson Junction and Paralta, Iowa.
He would run south one day, and return
the next day over the same line of road.
The south-bound train was known as "No. 91,"
and the north-bound train as "No. 92." These
numbered trains ran daily and were regular freight
trains, but the train on which Graham was act-
-ing as engineer made the round trip in two
days. On January 27, 1893, the day of the accident,
and while on the south-bound trip, the conductor of
the train, while at Monticello, received a telegraph
order from the train dispatcher to meet an extra at
Anamosa, of which train one Williams was conductor.
A copy of this order was given to Graham, the engi-
neer. No. 91 was due at Anamosa, according to the
time-table, at 2:45 p. m.; and No. 92 was scheduled to

arrive there from the south at 3:23 P. M. One Haggerty was the conductor of No. 91, Graham's train, and one Dignan was a brakeman on said train. No. 91 was late that day, and arrived at Anamosa about 2:55 P. M. When No. 91 pulled into the Anamosa yard, the Williams extra was standing on the side-track,—a fact which both Graham and Haggerty knew. No. 91 stopped at Anamosa, and the conductor went into the depot to the telegraph operator, for orders. He received an order from the train dispatcher. It was directed to the conductor and engineer of first section of No. 91, and to the operator at Anamosa, and advised them that the second section of No. 92 would meet the first section of No. 91 at Springville. Trains No. 91 and No. 92 were both being run in two sections. At the time of receiving this order, the conductor also called for and received a clearance card from the operator, reading as follows:

"To Haggerty, Conductor Train No. first, 91.

"I have no further orders for your train. Signal is out for operator.

"☞ This notice does not interfere with or countermand any orders you may have received from the Train Dispatcher.        Arthur, Operator."

Haggerty handed one copy of the order and clearance card to Brakeman Dignan, and told him to give them to Engineer Graham, which he did. Graham, who remained on his engine all of the time the train was in Anamosa, read them, handed them to his fireman, who read them, and returned them to Graham, who placed them in his box. Graham then looked out of the cab, and the conductor gave a signal to go, which Graham obeyed, and the train pulled out for Stone City. . It was between 3:11 and 3:15, P. M., when the train left Anamosa. Stone City is the first station south of Anamosa, and about five miles distant from the former place. When train No. 91 reached a

point about half-way between Anamosa and Stone City, it collided with the first section of No. 92, and Engineer Graham was seriously injured. He was taken to Anamosa, to the office of Dr. Gawley, where he was examined, his wet and frozen clothing removed, and he was wrapped in dry, warm blankets, and was given such treatment as seemed necessary. About an hour and a half thereafter, the defendant's agent at Anamosa appeared with Dr. Adair, the company's surgeon, and, against the remonstrances of the injured man, moved him to an hotel a quarter of a mile distant, at which place he died, at about half-past eight o'clock that night. Plaintiff claims that by reason of the conductor's negligence, and by reason of the exposure in moving Graham to the hotel, by the company's surgeon, Graham was killed. Defendant contends that Graham's negligence contributed to produce his death, and therefore plaintiff cannot recover.—*Affirmed.*

*Sheean & McCarn* and *Charles A. Clark* for appellant.

*Charles B. Keeler* and *H. M. Remley* for appellee.

KINNE, J.—I. The negligence of Conductor Haggerty is conceded. The controlling question is as to the negligence of Graham, if any, which contributed to produce the accident. Many rules of the defendant company are relied upon, and we make reference to some of them. Rule 1 provides that persons accepting employment with the company do so with full knowledge of the perils incident to the operation of railways, and agree to exercise due care in the performance of their duties to prevent accidents. Rule 2 provides that employes must have a copy of the rules in their possession when on duty, and must acquaint themselves

with all the rules; and no one will be permitted to run an engine until after passing a thorough examination on the rules by the superintendent. It is admitted that Graham passed such an examination. Rule 4 provides that, in all cases of doubt, the employe shall take the safe course. Rule 15 relates to time-tables, and provides that "when but one time is shown it shall be regarded as leaving time. * * * Trains will not leave station before the time specified, unless so directed." "(41) Trains in a specified direction will have the absolute right to track over trains of a similar or inferior class moving in the opposite direction. This will be indicated on the different divisions by special rule on face of time-card." "(44) No train shall assume the rights of any other train without orders. * * *" "(45) No train having the right to the road must leave any station where, by the time-table, it should meet a train of the same class until five (5) minutes after its time; and this must be observed at every succeeding station until it shall have met the expected train. The five (5) minutes are allowed for the variation of watches, and must not be used by either train." "(50) Train and enginemen will be held equally responsible for the violation of any of the rules governing the safety of trains, and they must take every precaution for the protection of trains, even if not provided for by the rules." ("51) The conductor will have charge and control of the train, and of all persons employed on it, and is responsible for its movements while on the road, *except when his directions conflict with these rules, or involve risk or hazard, in either of which cases the engineer will be held alike accountable.*" Rule 99 provides that the engineer must read and understand orders before starting a train. Rule 110 provides that, "in running trains by special orders, each section shall be taken and considered as a separate and distinct train, and shall receive and run only

under special orders addressed to its own conductor and engineer."

Under the rules and the evidence, was Graham negligent in starting his train as he did, in response to the orders of the conductor? We have seen that Graham was conversant with the rules, was familiar with the time-tables, and therefore knew when trains arrived at stations, and where they should meet. He knew that the first section of No. 92 had the right to the track, as against No. 91. He had no knowledge that said section of No. 92 was late. Indeed, he had no right to assume that it was not on time, in the absence of orders indicating such to be the case. He knew his train had no right to assume the rights of the first section of No. 92 without orders to that effect. He knew that if the first section of No. 92 was late, it would not leave a station where by the time-table it should meet a train until five minutes after its time, and that this would be observed at each succeeding station until it met the expected train. He knew that No. 92 was run that day in two sections. The orders he received clearly indicated that, even in the absence of other means of knowledge; He knew his train was to meet the Williams extra at Anamosa, and the evidence shows that he recognized it as that train when he pulled into Anamosa, by signals exchanged with the engineer of the extra. He knew his own train was behind time at Anamosa, and that, under such circumstances, he must not run on the first section of No. 92 time. He knew that No. 92 was a regular train running on time-card schedule, and that, when he pulled out of Anamosa, he had no orders whatever as against the first section of No. 92. He knew that the first section of No. 92 was not due at Anamosa until 3:23 P. M. He must be presumed to know that it was between 3:11 and 3:15 when he left Anamosa for Stone City. Assuming, as was his duty

in the absence of orders showing the contrary, that the first section of No. 92 was on time, he knew it had left Stone City before his train left Anamosa. He knew that it was less than five miles between the two stations, and therefore he left Anamosa with the certain knowledge that a collision with the first section of No. 92 was inevitable. Whether, as a matter of fact, Graham thought of the first section of No. 92 before he left Anamosa, will never be known. That it was his duty to do so there can be no doubt. Haggerty appears to have thought of it for a moment after he came out of the telegraph office at Anamosa with his order and clearance card, for he spoke of the Williams extra as being the first section of No. 92, forgetting apparently the fact that it was not the first section of No. 92, but the Williams extra, as to which he had received an order when at Monticello. Without stopping to find out whether the first section of No. 92 was coming, or where it was, Haggerty ordered Graham to start the train. Graham had no knowledge of the conversation between the conductor and brakeman touching the train at Anamosa being the first section of No. 92, and Graham and Haggerty had no conversation while at Anamosa.

With all this knowledge, what was Graham's duty, under the rules, as to starting the train? Was he bound to obey the conductor's orders, or might he, under the provisions of Rule 51, properly refuse to start the train? Right here it should be said, that the only effect of the clearance card was to notify the conductor and engineer that the operator had no further orders for that train. It did not authorize the starting of the train, contrary to the rules or orders. Appellant's counsel cite many cases determined by this court, in which the doctrine is clearly recognized, that a train is under the control of

the conductor, and that, as a rule, other train men must obey his orders. *Hoben v. Railroad Co.,* 20 Iowa, 568; *Dewey v. Railroad Co.,* 31 Iowa, 376; *Frandsen v. Railroad Co.,* 36 Iowa, 375; *Lane v. Railroad Co.,* 69 Iowa, 446 (29 N. W. Rep. 419); *Rayburn v. Railway Co.,* 74 Iowa, 637 (35 N. W. Rep. 606) and (38 N. W. Rep. 520); *Hosic v. Railway Co.,* 75 Iowa, 683 (37 N. W. Rep. 963); *Haas v. Railway Co.,* 90 Iowa, 259 (57 N. W. Rep. 895). We have carefully examined all of these cases. In none of them, except the last, was any question of the construction of rules involved. In some of them the rule of obedience was based largely upon the fact that there was no time to consider as to the safety of the act ordered to be done by the superior officer. In others, stress seems to be laid upon the fact, that the train was in motion, and it would be a dangerous doctrine to permit a subordinate trainman, under such circumstances, to obey, or refuse to obey, as his judgment might dictate, or to decide that the act ordered to be done was safe or unsafe. *Haas' Case* is relied upon as conclusive of the question here presented. In that case, Rule 50, heretofore set out, was considered; and it was held that it must receive a reasonable construction, that it "applied to each one [trainman] within the range of his duties, and did not make him [the fireman] responsible for the wrongful actions or omissions of others." Rule 51 was not considered in that case. That rule provides, as we have seen, that the conductor has "charge and control of the train and of all persons employed on it, and is responsible for its movements while on the road, except when his directions conflict with these rules, or involve risk or hazard, in either of which cases, the engineer will be held alike accountable."

The argument of appellant is that, when Graham was ordered by the conductor to start, he had a right to assume that the conductor had some information

relating to the first section of train No. 92, which jus-
tified them in running on No. 92's time.   Such infor-
mation could only come to Haggerty in the form of
an order from his superiors.   The clearance card
advised Graham that the operator had no further
orders.   So far, then, as Graham had any knowledge,
the conductor's order to him was in direct violation
of the rules, and obedience to it involved the risk and
hazard of a collision.   Might he, under the circum-
stances, and in view of the rules, assume that the con-
ductor had information which made it safe and proper
for the train to proceed, which he (Graham) did not
possess, and as to which Graham made no effort what-
ever to ascertain the facts?   To so hold is to nullify
the rule, which, under circumstances like those dis-
closed in this case, imposes a responsibility upon the
engineer, which he cannot escape by assuming the
existence of facts as to which he has no knowledge.
Rule 51, authorizes the engineer to disobey the orders
of his conductor, when said orders conflict with the
rules, or when he knows that to obey them involves
risk or hazard.   Appellant urges that it is unreason-
able to hold the engineer "alike accountable" when
the orders given him conflict with the rules or involve
risk or hazard.   Counsel say no one can be held
responsible for the acts or omissions of another, unless
he has knowledge of them, or, by the exercise of rea-
sonable care and diligence, should have such knowl-
edge.   Let that be conceded.   We have already
endeavored to show that Graham did have knowledge
that the order to start was in violation of the rules,
and that he knew that obedience to it involved risk
and hazard; even the certainty, we may say, of a col-
lission with the first section of No. 92.   Graham had
no right, under the rules and circumstances, to act
upon supposition; he had no right to assume the
existence of facts which, if true, might make it safe

and proper to proceed; but he was authorized to act only upon facts as to which he had knowledge. If force and effect are to be given to Rule 51, then it must be said, in the light of the undisputed facts, that, as a matter of law, Graham's own negligence contributed to his death, and hence plaintiff cannot recover. We are not justified in ignoring this rule, which appears to have been made in the interest of protecting the lives of employes of the company, as well as others. It is to be remembered, also, that this is not a case where one is compelled to act in an emergency in such haste as to have no time for deliberation, and therefore his act, if wrong, might be excused. We have examined the cases referred to, and find none where the question involved is like that in the case at bar.

II. Recovery is also sought against the defendant company because its surgeon, Dr. Adair, who was employed and paid by it to treat its injured employes, as an act of charity or humanity, wrongfully and negligently moved Graham from Dr. Gawley's office to the hotel, which act, it is claimed, contributed to produce his death. It is not claimed that Dr. Adair was not a skillful physician, or that the defendant did not exercise due care in employing him, but the claim is made that he acted wrongfully and negligently in doing as he did. We understand the rule to be well settled by a large number of cases that, under such circumstances, the defendant is not liable for acts of negligence of the physician who is employed to treat gratuitously its injured employes. We refer to a few of the cases: *Eighmy v. Railway Co.*, 93 Iowa, 538 (61 N. W. Rep. 1056); *Railroad Co. v. Price* (Fla.) (13 South Rep. 640); *Railroad Co. v. Howard* (Neb.) (63 N. W. Rep. 872); *Railroad Co. v. Zeiler* (Kan. Sup.) (38 Pac. Rep. 282).

What we have already said sufficiently answers the argument as to the alleged error of the court in refusing the instructions asked by appellant. We think the court properly sustained defendant's motion for a verdict.—AFFIRMED.