CINCINNATI, N. O. & T. P. R. CO. v. McGUFFEY.

(Circuit Court of Appeals, Sixth Circuit.   June 12, 1918.)

No. 3121.

1. MASTER AND SERVANT ⟨⟩286(34)—MASTER'S LIABILITY FOR INJURY TO SERVANT—SWITCHMAN.

A switchman, riding two cars at night down a repair track about 1,000 feet long, the first half of which was downgrade, before reaching the bottom of the grade was killed by collision with a loaded car standing on the track.   It was customary to place cars standing on the track near the other end on the level.   Why this car was left where it was did not appear.   *Held*, that whether the company was negligent in so doing was a question for the jury.

2. MASTER AND SERVANT ⟨⟩222(1)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK.

A switchman, working under orders of a foreman, in "kicking" cars upon a switch track at night, did not, as matter of law, assume the responsibility or risk of such movement, although in immediate charge of the operation.

3. MASTER AND SERVANT ⟨⟩286(40)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Whether a switching foreman was negligent in failing to warn a switchman, who at night was riding cars which had been kicked on a downgrade switch track, of the presence of a car standing on the track ahead, *held*, under the evidence, a question for the jury.

In Error to the District Court of the United States for the Eastern District of Tennessee; Edward T. Sanford, Judge.

Action at law by Lena McGuffey, administratrix of the estate of A. B. McGuffey, deceased, against the Cincinnati, New Orleans & Texas Pacific Railway Company.   Judgment for plaintiff and defendant brings error.   Affirmed.

Wright, Jones & Saxton, of Knoxville, Tenn., and George Hoadly, of Cincinnati, Ohio (Edward Colston, of Cincinnati, Ohio, of counsel), for plaintiff in error.

W. Y. Boswell, of Oakdale, Tenn., and Turner, Kennerly & Cate, of Knoxville, Tenn., for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and COCHRAN, District Judge.

KNAPPEN, Circuit Judge.   The parties will be designated here as in the trial court.   McGuffey, the deceased, was killed in the course of his employment as member of a switching crew in the railway company's yards at Oakdale, Tenn.   His administratrix recovered judgment under the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1916, §§ 8657–8665]), which concededly applies.

East of and parallel with the repair or "rip" track in the northern section of the yards was a series of other tracks, the westerly of which was No. 6.   From the frog of the switch connecting with track No. 6 the "rip" track descends to the northerly at a grade of about 1 per

cent. for about 415 feet, when it reaches a level which is maintained for a further distance of at least 550 feet. The deceased, at between 4:30 and 5 o'clock in the morning of October 28th, when it was "just getting daylight" (there being a light fog), was riding a cut of two bad-order cars kicked from track No. 6 onto and down the repair tracks; the kicked cars collided with a loaded scrap-iron car standing on the westerly of the repair tracks, about 50 feet before the level was reached, and thus about 400 feet from the point of the switch where the shunting movement began.

Against a general motion by defendant for a directed verdict, and in denial of the requests later referred to, the trial court submitted to the jury three asserted grounds of defendant's negligence: (1) In respect of placing and leaving the loaded scrap-iron car on the repair track at the time and in the location in question; (2) in respect of the alleged speed at which the switched cars were kicked onto and down the repair track; and (3) in that the foreman of the switching crew, after learning of the position of the scrap-iron car, and that the switched cars were going rapidly down the repair track, failed to effectually warn deceased of the impending collision and to give him opportunity to escape.

That deceased was on one of the switched cars when they collided with the scrap-iron car, and was killed by that collision, must, for the purposes of this review, be taken as established. It is necessarily so found by the verdict, in view of the court's charge; and, although there was substantial evidence to the contrary, the verdict in that respect is sustained by substantial testimony. As the record is made up, the judgment should be affirmed, provided defendant's requests to exclude from consideration both the first and third submitted grounds of negligence were properly denied.

The testimony relating to each of these questions was in sharp conflict; upon either it would support a verdict in defendant's favor. But it scarcely need be said that on the motion for an instructed verdict, wholly or in part, the trial court was bound to take the view of the evidence, and of the inferences deducible therefrom, most favorable to the plaintiff, and that we cannot reverse merely because we may entertain a different view or draw different inferences than accepted by the jury.

[1] 1. The presence of the scrap-iron car on the repair track. Construing the testimony most favorably to plaintiff, it was open to the jury to conclude that it was defendant's rule and custom in putting cars on that track to place them, in the interest at least of easy handling, at the far end of it, and thus past the grade therein and well down in the level part, which, as already said, extended about 550 feet beyond the foot of the grade; that independently of such rule or custom, and in view of the fact that the repair track was to be used by switching crews in the nighttime, when the track was not well lighted, in either pushing or kicking cars thereon, due care for the switchmen's protection required the spotting of the cars well beyond the foot of the grade; that the scrap-iron car in question was not in bad order, but had been brought onto the repair track on the day before for pur-

poses of loading, and at 4 or 5 o'clock on the afternoon of that day was stationed near a scrap-bin, about 350 feet north of the place where it was at the time of the collision (how or why moved to its later position, about 50 feet up the grade, does not appear); and that there was enough unoccupied space north of this later position to permit keeping it beyond danger of the collision in question.

[2] It appeared, however, that the repair track was frequently full of cars at night, that just before the movement in question Hutson, the switching foreman, had followed down the main track the first two cars of a cut of seven then being distributed, and that thereupon the deceased, who was a switchman under the foreman, took charge of the kicking onto the repair track of the next two cars (an empty box car. followed by a loaded gondola); and defendant contends that deceased thus took the sole responsibility for the movement, and not only assumed the risk of collision with the other cars, but was negligent in not looking out for his own protection by ascertaining the presence of the scrap-iron car on the repair track, as well as by kicking the cars down the grade instead of shoving them down, as the company's rules required, and that the negligence of deceased was the sole proximate cause of the collision and accident, thereby preventing recovery under the rule of Great Northern Ry. Co. v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732.

But this contention fails to give due weight to the facts which there was evidence tending to sustain: First, that although the deceased, in Hutson's temporary absence with the cars previously kicked on the other track, was in *immediate* charge of the movement of the two cars here in question, yet his charge was subject to the direction of Hutson. The evidence, indeed, would warrant an inference (perhaps natural enough without express testimony) that the foreman had himself instructed the kicking of the two cars down the repair track; for, while another member of the crew testified that "McGuffey was lining up the cars" and that it was the same "for McGuffey to tell me as it was for Hutson to tell me, and McGuffey knew where the cars were going as well as Hutson did," he added, "By the line-up of the cars is meant instructions as to where they are to go; that Hutson had told him where." [1]  And, second, that deceased could see the scrap-iron car for but 5 to 7 car lengths (approximately 235 feet), while the scrap-iron car, when the switching movement began, was more than 100 feet still further distant. The fact that in its prudent use the repair track might have been so full as to make it proper to place the scrap-iron car where it was encountered would not be enough to bar recovery on account of a negligent location thereof. We think it was open to the jury to conclude that the alleged negligence of deceased was not the sole proximate cause of the collision. It thus did

[1] This witness, who was yard foreman "off and on" for several years, partly before and partly after the accident, and was regular yard foreman at the time of the trial, testified that "it was customary there at the time to kick cars into this rip track at night, but sometimes they would be shoved in," and that "we were handling these two cars that night just as we were always accustomed to handle them, and just as McGuffey was accustomed to handle them, and he was riding them just as he had rode them many times before."

not, as matter of law, bar recovery. Pennsylvania Co. v. Cole (C. C. A. 6) 214 Fed. 948, 131 C. C. A. 244; N. Y., C. & St. L. R. R. Co. v. Niebel (C. C. A. 6) 214 Fed. 952, 131 C. C. A. 248.

[3] 2. The alleged negligent failure to warn deceased of the danger of collision with the scrap-iron car. There were two witnesses to the accident. According to the testimony of one of them, when the box car which deceased was riding was "two or three car lengths [perhaps 100 feet] in the rip track," and still south of where the foreman on track 6 was standing (at such point the two tracks would be about 18 feet apart), the foreman, in an ordinary tone of voice, but without indicating alarm, called out to the deceased to "Get off, Mac!" or "Look out, Mac!" "like one who would want a man to get off and come on and help"; that deceased started to "holler something," appeared confused, first started north, and then turned and came down the ladder of the box car and stepped across to the platform of the gondola (in this position he presumably could not see the scrap-iron car on account of the greater height of the box car in front of him); that at this time, when he was "probably five or six car lengths [which would be perhaps 200 feet] from the point of the rip track switch" (at such point the two tracks would be about 32 feet apart), the foreman called to deceased a second time, the noise made by another engine preventing the witness hearing what was said; that meanwhile the foreman "might have walked a little farther north," how far does not appear, but not over to the side of the car deceased was on; that soon after "hollering" the second time the foreman started to the rip track. It would seem a proper, although not a necessary, inference that the car which deceased was riding passed the foreman (although on the other track) at some time after the foreman had first called out. According to the other witness, when the foreman first called out to deceased, the switched cars were at a point which would seem to be not more than 100 feet south of the scrap-iron car; and this witness, who was at the time 40 to 50 feet southerly of the foreman, and 150 to 200 feet from the point of collision, then saw the scrap-iron car. At this point the foreman would be perhaps 70 feet from deceased and about 116 feet from the point of collision. According to this witness the foreman ran down immediately after the one call testified to; the collision seems to have occurred before he reached its location. The testimony as to the speed of the kicked cars varies from 2 to 3 miles (when they left the switch), according to the one witness to 6 to 8 miles, according to the other witness, at least when seen nearer the point of collision. The speed would naturally increase somewhat as the grade was descended. There was testimony that at much more than a 3-mile speed the switchman could safely have jumped from the moving car.

The inference that the foreman saw the scrap-iron car and called to deceased to get off, or look out, as far back as 100 feet from the rip track switch, is perhaps not the more natural one; and if the car was not seen until deceased was but 100 feet from the point of collision a negligent failure to warn could scarcely be inferred. But we are constrained to the view that it was open to the jury to draw the

inference that the foreman saw the car in time to give effective warning, and that he negligently failed to give it, upon a consideration of all the evidence, including a harmonizing of the conflicting testimony as to the relative distances and rates of speed, and having in mind that no explanation other than the discovery of the scrap-iron car is given for the foreman's first call to deceased; for the foreman, who was still in the employ of the defendant at the time of the trial, and had been called by plaintiff to testify to facts showing the interstate character of the movement, was not called by defendant to testify as to his knowledge of the presence of the scrap iron car, or his attempts to warn deceased thereof, or to any of the facts directly relating to the collision. We are the better content with this conclusion from the fact that the trial judge, whose opportunities for weighing the testimony were better than ours, and who did not hesitate to set aside the verdict on a former trial because of an opinion that the deceased more probably fell off the car before the collision, and who expressed to the jury on the second trial his opinion that deceased was guilty of contributory negligence, yet refused, without opinion, a motion for a new trial following the second verdict, presumably for the reason that in his judgment it was sustained by substantial evidence, as it certainly was upon the point for which the first verdict was set aside. The size of the present verdict is consistent with a finding of and due allowance for contributory negligence.

Without reference, therefore, to the question of alleged excessive speed of the kicked cars, the judgment below should be affirmed.