This is an action brought under the Federal Employers' Liability Act of 1908, ch. 149 (35 Stat. at L. 65), by the administrator of Benjamin F. Dyson against the appellant. On May 5th, 1921, Dyson sustained injuries while operating as motorman on a work train on the "Short Line Division" of the appellant's road, of which he died the next day. The important question for our determination, indeed the only one it is necessary to discuss at length, is whether Clarence Johnson, the conductor on the train, was guilty of such negligence as made the appellant liable, notwithstanding it is shown that Dyson was negligent.
The work train was operating under special orders on that day. Train Order No. 2, addressed "To Conductor and Motorman," ordered that "Car No. 7 work extra between Glenburnie and Power House Cove from 6.30 A.M. until 12.30 P.M., and Order No. 6 directed that "Car No. 7 will work extra between Linthicum and Elvaton from 12.30 P.M. until 5.00 P.M." Both the motorman and the conductor received copies of these orders, and compared them to see that they were the same.
The main line of the W., B. A.E.R.R. Co. runs from Baltimore to Washington, and what was formerly the Annapolis and Baltimore Shore Line was merged in and known as the Short Line Division of the W., B. A.E.R.R. and joins the main line at Linthicum, or what is also known as Short Line Junction. The cars on that division run over the same tracks, into and out of Baltimore, as those of the main line do. In going south from Baltimore to Annapolis the stations between Linthicum and Elvation are Shipley, Ferndale, Glenburnie, Saunders Range and Marley. There *Page 326 
is a double track between Marley and Elvation, a siding at Saunders Range, at Glenburnie there are two sidings, one on each side of the main track, what is spoken of as Cromwell Siding, and a double siding at Ferndale.
Time table No. 8, which shows the schedules on the Short Line Division, went into effect on the 2nd day of May, 1921, and was in effect on the day of the accident. Those time tables were delivered to the employees the evening before. Johnson took his and signed for it and he gave Dyson his and he signed for it. A schedule, known as No. 7, had been in effect from March 14, 1921, until the one of May 2nd was issued, the principal difference between the two being that on No. 8 there were five trains which only ran on Saturdays and Sundays, while they were daily on No. 7. Amongst other trains from Baltimore to Annapolis on both schedules were No. 337, leaving Baltimore at 2.20 P.M.; No. 339 leaving there at 2.50; and No. 341, leaving at 3.20. Without referring to all, No. 339 was due at Linthicum at 3.13, at Shipley at 3.15, at Ferndale at 3.20, at Glenburnie at 3.23, and at Marley at 3.27. No. 341 was due at those places, respectively, at thirty minutes later. The work train had been working at Glenburnie. It started to rain and the track men, not caring to work in the rain, made some complaint to the foreman, who said: "We will go to Marley and get rid of these tools. They want to turn some rails there tonight, and we will quit for the day." The work train then went to Marley, which is the first station north of Elvaton. After they unloaded, Mr. Hobbs, the foreman of that gang of men, said: "All right, we will go back."
Clarence Johnson, the conductor, who was produced by the plaintiff, testified as follows:
"I had on a long gum coat and gum boots, buttoned up for the rain. Mr. Dyson was in the motorman's cab, dry, equally capable as I was to look at time tables, and I asked him, I says, `Uncle Ben, look and see what time the next train is due Linthicum.' Mr. Dyson did not use the time *Page 327 
table given to him by the company. He used a copy on a piece of writing paper designating the time of arrival of trains, and he said the next train was due at 3.45, I looked at my watch and saw we had ample time to go to Shipley — make it Linthicum — and I said, `We will go ahead.' So I got on the train and we started north. We stopped at Glenburnie and some of the trackmen got off. We stopped at Ferndale and some of the trackmen got off. We proceeded from Ferndale to put the train in a siding at Linthicum and had just gotten about two hundred feet north of Ferndale Station when the passenger train approached us and ran into us. That is up to the accident as far as I can go."
According to time table No. 8 there were on the Short Line Division daily half hour trains leaving Baltimore from 5.20 A.M. until 6.20 P.M., inclusive, with the exception of five which only ran every half hour on Saturdays and Sundays. That was also the case on the former schedule (No. 7) excepting the half hour trains left Baltimore daily throughout those hours, including the five which only ran on Saturdays and Sundays on Schedule No. 8.
Conductor Johnson was in the motorman's cab from Glenburnie, sitting on the sand box. When they were two or three hundred feet beyond Ferndale Train No. 339, a regular scheduled train, leaving Baltimore at 2.50 P.M., and the work train had a collision, which resulted in injuries to Johnson and also to Dyson, of which the latter died the next day. Johnson said he thought No. 339 was coming between forty-five and fifty miles an hour. He was asked why he did not speak to Dyson concerning 339 train and explained, "I did not think of the train at that time." He was asked: "Q. What would you have done if you had thought of the train?" and replied, "I would have cleared the train according to the rule, five minutes before the arrival of the train where we were."
That question and answer constitute the third exception, but we have stated it as it was asked and answered. Again *Page 328 
he was asked: "You did not say anything to Dyson about this train during the entire trip?" and his answer was: "It happened I asked for the time and I asked Mr. Dyson to look at the schedule and he looked at this piece of writing paper and copied from the schedule, and he said we have 3.45, and he being as old a man as he was in the railroad, and my being a younger man, I had confidence enough in him to think he noticed it properly, and I did not look at mine and no one else under the conditions, working as I was, and there would have been ample time to get to Shipley, providing he told me the right time, but he did not tell me right. That is as clear as I can tell you how it happened."
Every common carrier by railroad, while engaged in interstate commerce, under section 1 of that act, is made liable "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment." By section 3, it is provided that — "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee," provided that no such employee shall be held guilty of contributory negligence where the violation by such carrier of any statute enacted for the safety of employees contributed to the injury or death, and by section 4, that "such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."
As there can, under the evidence in the record, be no claim of defect or insufficiency in its equipment, or the violation by the appellant of any statute enacted for the safety of employees, or of any negligence of any other employee causing *Page 329 
the injury which resulted in the death of Dyson, we must, in determining this case, be governed by the effect of Johnson's action or non-action. Although we have had several cases before us under this act, the particular question now before us has not been hitherto passed on by us.
The motorman and conductor received the same orders, to work their train extra between the points named during the hours mentioned. Each had been furnished with a time table on which the time of all regular trains at the various stations was given, and there were special instructions on the back of the time table, one of which was "Extra trains must clear all regular trains five minutes. See Rules 208, 209 and 219." Each of them had copies of the rules.
Rule 208 says: "A train failing to clear the main track by the time required by rule must be protected as provided by Rule
219." (Italic ours.)
Rule 209 provides that: "All order trains must keep out of the way of regular scheduled trains and clear their time at least five minutes, unless they have been given a meeting or passing order, or other order relieving them from that necessity."
Rule 219 is a long one, and provides that when a train is detained for any cause, "the conductor must immediately go back with danger signals to stop any train moving in the same direction," and then provides for his placing torpedoes on the rail and returning to a point 1,200 feet from the rear of his train, where he must remain until an approaching train has been stopped, or is recalled by the whistle of his own train. That rule concludes: "The front of the train must be protected in thesame way when necessary, by the motorman." (Italics ours.)
Rule 225 is: "Both motorman and conductor are responsible for the safety of their trains and the proper fulfillment of all running orders received by them, * * * and under conditions not provided for by these rules must take every precaution for their protection." *Page 330 
Rule 323 is: "Motormen and conductors will be held equally responsible for the violation of any of the rules governing the safety of their trains and must take every precaution for their protection, even if not provided for in the rules. In case ofdoubt or uncertainty, take the safe course and run no risks."
(Italics ours.)
There are a number of other rules looking to the protection of the trains and employees themselves. Amongst others, No. 105, which provides that — "Motormen must not start their trains without first receiving proper signals from the conductor, andnever start without the signal being correct." (Italics ours.)
It would seem clear from the rules and what is said in this record that Dyson was not subject to the orders of Johnson in such way as to interfere with him (Dyson) operating the train or protecting himself. He was operating the car, and could have gone into a siding in ample time to avoid the collision. His injury resulting in his death was not due to any order or direction of the conductor, and it could not have been the intention of Congress to hold a carrier responsible for the death of a motorman under such circumstances as we have before us. This motorman, by his own mistake in reference to No. 339, was himself killed and caused injury to the conductor. It cannot fairly be said that the accident was caused by anyone but Dyson. We cannot hold the carrier responsible because the conductor did not detect the mistake of the motorman when he said the next train was due at Shipley at 3.45, when unfortunately that was 30 minutes after it was due, No. 339 being due there at 3.15, while No. 341 was due at 3.45. As said by the Court as to Wiles, in Great NorthernR. Co. v. Wiles, 240 U.S. 448: "His neglect might have extended the catastrophe to the destruction of passengers in the colliding train. How imperative his duty was is manifest. To excuse its neglect in any way would cast immeasurable liability upon the railroads, and, what is of greater concern, remove security from the lives of those who travel *Page 331 
upon them." In that case Wiles was in the caboose with theconductor, but his representatives were not allowed to recover; in this case the conductor was in the vestibule with the motorman. Why should the latter's representatives recover?
This conductor did not know that Dyson had made a mistake as to the time, and while, as we look back from the present, it might be thought it would have been better if Johnson had looked at the time table to see if Dyson was right, yet he had no reason to question the latter's accuracy. He knew that Dyson was regarded as a competent and reliable motorman, and had had more experience than he had had. It would not seem right to hold that because Johnson did not detect and correct Dyson's mistake, Dyson's personal representative can mulct the carrier in damages, although Dyson was operating the car, had the same opportunity that Johnson had to know when the next train was due, as he had been furnished a copy of the time table and the rules, and by the rules was required to have it with him. By the rules Dyson was at least equally responsible with Johnson for their violation, yet it is sought to unload the burden for the benefit of Dyson's representative and put it on the carrier because Johnson was equally responsible. We do not think that would be just, or calculated to protect passengers using the cars, or in accordance with the decisions applicable to the conditions in this case, as far as we have found them. The motorman's safety and that of the conductor were dependent upon his giving a correct answer to the conductor, who at the time of his inquiry was out in the rain, protected as well as he could be in his gum coat, which would interfere with his use of the time table he had, even if he had any reason to suspect that the motorman was in error, which is not shown, as the latter had, or was presumed to have, his own copy of the time table, and was known as a competent motorman.
We cannot attach the same importance that the appellee does to what the conductor said on the stand as to train 339 being out of his mind, and if he had been conscious of having *Page 332 
this accident, of course, would have cleared the train, as we have already explained why it was out of his mind — by reason of the mistake of the motorman; and no one of ordinary sensibilities would have felt otherwise when, as he knew then the sad results of the accident which, of course, could have been avoided if the motorman had gone on a siding at Glenburnie or at Ferndale, or if he had protected the front of the train as provided by Rule 219, when he stopped at either of those places.
We have, then, at the time of the accident, two employees of the appellant in the motorman's vestibule, the motorman running the train and the conductor, in the absence of some evidence to the contrary, being presumed to have been there on some business requiring his presence, as Rule 354 says: "Nor shall the conductor remain in the motorman's vestibule longer than is necessary to properly receive or deliver train orders, or to attend to any other business requiring his presence there."
If that is not to be presumed, we have the two there, the motorman knowing that the conductor was there, knowing, of course, that he (the motorman) was passing the sidings, and presumably having his time table with him.
The case of Davis v. Payne, decided by the Supreme Court of Oregon in June, 1923, and reported in 216 Pac. Rep. 195, is one of the most helpful we have found or have been referred to, as there are several opinions in it which not only clearly give the reasons of the different judges, but have collected most, if not all, of the decisions bearing on this particular subject decided by the Supreme Court of the United States, and many decided by the state courts. An alleged mistake in an order for the movement of a freight train was relied on in that case. It was contended, amongst other things, that because trains were invariably started upon a signal from the conductor to the engineer, the jury had a right to assume that the engineer was justified in violating the order and starting upon the signal of the conductor. The *Page 333 
court said as to that: "This contention overlooks the fact that, although it is the duty of the engineer to obey the signal of the conductor in starting the movement of his train in cases where the movement signaled for is not in violation of a train order or rule, nevertheless, under Rule No. 906, it is the duty of the engineer in all cases not to start his train in violation of a train order." See Rule 105, referred to above in this case. It was there held that "the concerted action of all or any number of the train crew, in disregarding the command of the employer, should not be imputable to the defendant as the negligence of the defendant, in any action against it brought by a member of the crew for injury resulting `solely from his own disobedience, orhis disobedience in concert with others.'"
The court said: "We therefore conclude that when two or more railroad employees act in concert, and none of them do any act except that which every other one intends that he shall do, and injury results to one or more of them from the combined act of all, and the doing of the combined act was known by all of them to be wrongful, or in disregard of a known duty, or in violation of a positive order of the carrier, and was not in obedience to any order of a superior, none of the parties so acting are entitled to recover under the Federal Employers' Liability Act, when the doing by them of the act is the sole proximate cause of the injury, and no concurring negligent act or omission of the carrier, or of some other agent, servant or employee of the carrier, in any way contributed to bring about the injury."
The case of Spokane I.E.R. Co. v. Campbell, 217 Fed. 518, affirmed in 241 U.S. 497, was relied on by the plaintiff in that case as well as in this case. The Circuit Court of Appeals held "that the element of proximate cause is eliminated where concurring acts of the employer and employee contribute to the injury or death of the employee," but the Supreme Court said: "We agree with this, except that we find it unnecessary to say the effect of the statute is wholly *Page 334 
to eliminate the question of proximate cause." The Supreme Court relied on the fact that there was a special finding that the air brakes on Campbell's train immediately before the accident were insufficient, and the decision was based on that provision of the act.
Another case relied on by the plaintiff was that of Ill. Cent.R. Co. v. Skaggs, 240 U.S. 66. There it was contended that Skaggs could not recover because the injury resulted from his own act, or from an act in which he participated, but the Supreme Court pointed out that there were two brakemen in that case, Skaggs and Buchta, and that Buchta occupied a position which enabled him to know what plaintiff did not, and said: "It was plainly permissible to infer from the testimony that the two men were not in positions of equal advantage, and Skaggs was entitled to the exercise of reasonable care on the part of Buchta in observing and reporting the position of the cars."
In Union Pac. R. Co. v. Hadley, 246 U.S. 330, the Supreme Court held that the defendant was negligent in the running of its trains, and hence the contributory negligence of plaintiff was not a bar under the act.
The case of Virginian R. Co. v. Linkous, 230 Fed. 88, reargued in 235 Fed. 49, and certiorari denied in242 U.S. 630, is quite analogous to this one. The engineer and conductor had received an order to meet and pass another train at Keever. Instead of stopping there, as directed, the engineer, with the conductor, first brakeman and fireman riding in the engine, went at full speed beyond Keever, where the train collided with the train they had been ordered to pass at Keever. All four of those employees were killed. The Circuit Court of Appeals said that it was insisted by counsel for plaintiff that plaintiff's decedent had lost his life "as a result of a combined mutual, concurring and joint failure of these four men to fulfill their primary duty by executing the order to meet No. 33 according to its terms and as prescribed by the defendant's rules, which was the controlling and proximate *Page 335 
cause of the collision. * * * While the Employers' Liability Act was manifestly intended to modify the law as it formerly existed so as to materially benefit those who might be injured in the future, by abolishing the harsh rule known as the `fellow-servant doctrine,' yet it cannot be reasonably insisted that it was the purpose of the act to afford relief where one's injury is due solely to his own reckless and indifferent conduct. After an exhaustive examination of the authorities cited we find nothing to support the contention of the plaintiff. Under the circumstances the jury could not reasonably have drawn any other inference than that the other employees were not in any degree primarily responsible for the accident. Such being the case, we are of opinion that the jury was not warranted in reaching the conclusion that plaintiff's decedent's death resulted in whole or in part from the negligence of the employees of the defendant." As shown above, the Supreme Court denied a certiorari in that case.
In the case of Great North. R. Co. v. Wiles, 240 U.S. 444,supra, a draw-bar had pulled out, causing the train to stop instantly, and it was the duty of Wiles, who was a rear brakeman of a freight train, to at once go back and protect the rear of his train. Instead of doing that, he remained in the caboose with the conductor, and he and the conductor were killed by a following fast passenger train. Although he was not responsible for the draw-bar pulling out, and the conductor was with him in the caboose, it was held that there could be no recovery, as there was nothing to excuse Wiles' negligence. In Davis v.Payne, supra, Davis was engineer in charge of an engine attached to a local freight which collided with a train which had the right of way, resulting in injury to himself, killing the engineer on the other train and injuring other employees. The court said that "there was no intervening or concurrent act of negligence shown on the part of the carrier that in any way produced the injury complained of, or contributed to bring it about. He himself created the condition which brought about the *Page 336 
damage. No other member of the train crew did any independent act upon which he had a right to rely as a justification for his violation of the order, and it is no answer to say that because the other members of the train crew co-operated or participated with him in operating the train in violation of the orders of the company, their participation with him in the violation of an order that they were all bound to obey was the negligence of the carrier." JUSTICE RAND delivered the opinion, in which JUSTICES BURNETT and McCOURT concurred, as did JUSTICES BROWN and HARRIS on this question, although they agreed with JUSTICE BEAN, who filed a dissenting opinion on another ground. They said, in a separate opinion:
"The writers do not understand that any decision of the Supreme Court of the United States thus far reported gives support to the notion that if two employees are each bound to perform exactly the same specific duty and both the right and the obligation of each to perform that single specific duty is equal to the right and obligation of the other, each one of these two, who, acting in concert with each other, and each acquiescing in the conduct of the other, violates that single duty, which, though single was nevertheless imposed upon all, and therefore was common to all, can recover from the railroad company. To allow any one of such two or more employees to recover would be equivalent to holding that each of such two or more employees, though having acquiesced in the conduct of each other, and though having acted in concert, can say to the employer: "Although I was hurt because I failed to perform my specific duty, you are nevertheless liable for damages to me because another employee, acting in concert with me and with my acquiescence, failed to perform my duty for me."
Amongst other cases which might be cited are: Kendrick v.Chig. E.I. Co., 188 Ill. App. 172; Ellis' Admr. v.Louisville, H. St. L.R. Co., 155 Ky. 745, 160 S.W. 512;Ingram v. Atl. C.L. Ry. Co., 181 N.C. 491, 106 S.E. 565; *Page 337 Hull v. Virginian R. Co., 78 W. Va. 25; Virginia S.W.R.Co. v. Hill, 119 Va. 837; Missouri, K. and T. Ry. Co. v.Lenahan, 68 Okla. 73; York v. Chig., M. St. P.R. Co., 98 Ia. 544; Olson v. C., M. St. P.R. Co., 44 S. Dak. 47;Baugham v. New York, P. N.R. Co., 241 U.S. 237; Frese v.Chig., B. Q.R. Co., 290 Mo. 501. The last case mentioned was affirmed by the Supreme Court of the United States (Frese v.Chig., B. Q.R. Co., 263 U.S. 3). An Illinois statute was before the Court, and MR. JUSTICE HOLMES said: "The fireman was on the left, on the side of the other approaching train, the engineer on the right, where he could not see so well. But of course the witness could not testify which way the fireman turned his eyes after he saw only his back, and it is a mere speculation to argue that Savage did not do all that he could. Moreover, the statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice, he could not escape this duty, and it would be a perversion of the Employers' Liability Act (Apr. 22, 1908, c. 149, sec. 3; 35 Stat. 65, 66) to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more. See Great Nor. R.Co. v. Wiles, 240 U.S. 444, 448."
Of cases cited by appellee, we have already referred toCampbell's case, Skaggs' case and Linkous' case. He also cites Fitzpatrick v. Hines (Neb.), 179 N.W. 410; Grand TrunkR. Co. v. Lindsay, 201 Fed. 836; Authement v. Louisiana W.R. Co., 147 La. 816; Cin. N.O. T.P.R. Co. v. McGuffey,
252 Fed. 25; DeBaur v. Lehigh Val. R. Co., 269 Fed. 966.
Without citing other cases, it must be admitted that there are some differences of opinion expressed by the courts as to when the act of the employee is the sole cause of the result, but when the injured employee brought the injury upon himself, without some separate and independent act of another *Page 338 
or other employees which contributed or co-operated to bring about the injury complained of, we have found no case which permitted a recovery. If Dyson's representative can recover because Johnson was likewise negligent, and his negligence is chargeable to the employer, and Johnson can recover for his injury because Dyson was negligent, it may well be questioned whether that would not be contrary to public policy. While the learned judge below cannot be said to be alone in reaching the conclusion he finally did, we are not satisfied that his conclusion is in accord with the decisions of the Supreme Court under facts such as we have before us, and we cannot hold that a recovery is permissible under the circumstances of this case.
The appellant only presses the exceptions to the rulings on the evidence as presented by the third and fifth bills of exceptions. We find no error in the ruling on the third, and while we do not see the relevancy of the question in the fifth, it is at most a harmless error. It follows from what we have said that in our opinion the plaintiff was not entitled to recover and hence the second prayer should not have been granted. In our judgment the plaintiff was not entitled to recover and the defendant's first and second prayers should have been granted. Having reached that conclusion, the plaintiff's second prayer should have been rejected and it becomes unnecessary to discuss his fourth prayer. Our conclusion as to the first and second, or either of them, must result in a reversal without awarding a new trial. If we had not reached the conclusion stated we would have been of the opinion that there was error in rejecting the defendant's fifteenth and eighteenth prayers and modifying the seventeenth, which would have required a reversal, but not without granting a new trial.
Judgment reversed, without awarding a new trial, the appelleeto pay the costs. *Page 339