## CHARLESTON.

Mary Hudson, *Admrx., Etc. v.* Norfolk & Western Railway Company

(No. 6214)

Submitted April 17, 1928.   Decided November 27, 1928.

438

*R. E. Woolwine* and *Randolph Bias,* for plaintiff in error.
*F. M. Rivinus, Goodykoontz & Slaven* and *Duncan & Holt,* for defendant.

LIVELY, PRESIDENT:

Plaintiff as administratrix sued for damages for the death of her husband, a railroad engineman, under the Federal Employers' Liability law, alleging negligence. At the conclusion of the evidence, the court instructed the jury to find for defendant, which was accordingly done, and judgment of *nil capiat* entered, from which plaintiff prosecutes error. The sole question is whether the evidence is sufficient to take the case to the jury. The only material question of fact about which there is appreciable controversy is the theory of plaintiff that a rule promulgated by defendant for the safety of the deceased, his co-employees and the public had been, by custom of long standing, nullified with actual or constructive notice to defendant railroad company.

Plaintiff's decedent was a competent locomotive engineer and had been employed by defendant for approximately twenty years. On July 5, 1926, in the early morning he started from Williamson, in Mingo county, with a trainload of empty coal cars for distribution to the coal mines, with his train crew consisting of Driscoll, conductor, two brakemen,

and Underwood, fireman, and arrived at Iaeger yards, called also Auville Yards, about fifty miles eastward from Williamson, where it became necessary for him to replenish his locomotive with coal and water. The situation of the yards and the tracks is visualized and made plain by the map here reproduced. The engine and tender were uncoupled from the train of empty cars on the main line immediately west of the entrance to the west end of the "wye", and were run up the west leg of the wye to the coaling bins and water tank. From where he left the main track to the convergence of the two legs of the wye is a distance of 782.6 feet. The distance from the point of convergence of the two legs of the wye to the main line eastward towards Iaeger is 700.5 feet; stated differently the west leg of the wye first entered by Hudson is 782.6 feet long and the east leg is 700.5 feet. Near the west end of the west leg stood the tower where the telegraph operator worked. Having coaled and watered, he backed his engine back down to within 356.8 feet of the convergence of the legs and found the dwarf signal at that point red. The towerman had received orders directing Hudson to take his train of empties back towards Williamson instead of proceeding eastward. While he was coaling, a passenger train on its schedule time had entered the "block" on the main line which automatically caused the block signals at each end of the legs where they joined the main line to display red, or danger signals. That passenger train's route was from Iaeger Station about one-half mile east of the Auville Yard down to the end of the west leg near the tower which leg it would enter (as Hudson had done) and proceed over it and on up the North Fork branch line. When Hudson reached the red dwarf signal, he stopped and sounded four blasts of his whistle, whereupon the dwarf signal changed to yellow, which under the rules permitted him to proceed to the next red signal near where the legs joined the main line. These signals were automatically red made so by the passenger train then on the "block" and could not be changed until that train passed off the block. When he came to the junction of the two legs, he found the west leg switch set against him, Underwood the fireman calling out to him, "The switch is set

for the east leg of the wye and the board is red." Hudson then stopped and again sounded four blasts of his whistle, and brakeman Smith got on the ground and gave a "scissors" signal to the towerman to throw the switch. The towerman, five or six hundred feet away, thereupon gave a hand signal, using his handkerchief, and Hudson proceeded over the east leg to the red block about 700 feet away, and without stopping passed by it, and onto a derail or "bug" a short distance away which threw the engine over the embankment into the river, causing his death.

Plaintiff's contention is that the towerman negligently signalled Hudson to proceed over the east leg of the wye (when the latter called for signals when he found the switch to the west leg set against him) and, Hudson relying thereon, met his death; and even if it was Hudson's duty under the rules to stop at the next red block, and ascertain if it was safe for him to run by it, the negligence of his fireman, after he had run past the red signal, in not warning him that the derail was on the track caused the accident, for either of which negligent acts on the part of his fellow employees recovery could be had under the Federal Employers' Liability Act.

Defendant interposed its rules for the conduct of its employees in discharging their duty, and especially rules 904 and 906. Rule 904 says: "Trains or engines must be run to but not beyond a signal indicating stop, except as provided in Rule 906." And Rule 906 says: "Enginemen and trainmen must not proceed on hand signals as against interlocking signals until they are fully informed of the situation and know that they are protected. Trainmen must not give proceed hand signals which conflict with interlocking signals." There can be little question what this rule means. It is plain, clear and unambiguous. Its interpretation is for the court, and not for the jury. *Great Northern Ry.* v. *Hooker,* 170 Fed. 154, opinion by Van Deventer, now a Justice of the Federal Supreme Court. Hudson was well acquainted with this yard, its tracks, automatic signals, and the rules. He knew that the passenger train was on the block and then due to arrive. He knew it was a violation to proceed on hand signal until he was fully informed of the situation and *knew*

he was protected. Here was a red light which always spelled danger and which told him that a train was on the block, and which he knew was a passenger train due to arrive. He knew that just beyond the red light was a derail, a "bug", which, if on, would derail him. He was backing and the curve of the track prevented him from seeing it as he approached, although the fireman could have seen it if he had looked, which he says he did not do. To pass that red signal and enter the main line invited death, not only from the "bug" but by collision with a passenger train and probable wholesale slaughter of its crew and passengers. It is true that the passengsr train was then on the block at the station some distance away, but no effort was made by either Hudson or the fireman to fully inform themselves in that regard. Hudson knew that he was violating the rule in running by that red light until he was fully informed of the situation and *knew he was protected*. Can it be said with assurance that because the fireman did not look for the derail and did not warn him of danger that he was fully informed of the situation, and knew that he was protected against his violation of the rule? Both knew the derail was there, but nothing appears that either made any effort to inform themselves of the removal of that known danger. Here was a known danger, and he could not depend upon another to avoid it under such circumstances. *Leitch* v. *C. & O. Ry. Co.* (U. S. Sup. Ct. decided Oct. term 1927), 48 S. Ct. 336. In case of a known danger it is one's duty to take the safe course. This rule of conduct is commonly known in railroad parlance as "safety first".

There is some conflict in the evidence as to the meaning of the hand signal given by the towerman in response to the four blasts of the whistle sounded when the engineman found the switch to the west leg of the wye set against him, and in response to the "scissors" signal (throw the switch) by the brakeman; some saying that it meant to proceed to the automatic red light and stop; others that it meant to go by onto the main line. This conflict but accentuates the plain duty imposed by the rule that a red light must not be passed on hand signal until the enginemen and trainmen are fully informed of the situation and know they are protected. The

rule conserved and rendered harmless a misunderstanding of hand signals. This conflict is not important, for discarding the evidence that it meant only to go up to the red light, the rule was to prevent what actually happened, namely, passing by without stopping or investigating and knowing that it was safe to pass by. But it is said that this rule 906 had been abrogated on that yard by custom, and could be disregarded by Hudson with impunity. Three witnesses, two of whom had years before ceased to work in railroad employment, and one who was working, say that they had known many instances where enginemen had passed by automatic red lights on hand signals on that and other yards. Neither of them would say that they had done so, or observed it done, from a signal received at the place and under the circumstances here detailed. The rule permits passing by a red light, on condition that safety is assured from personal investigation, and these witnesses do not say that they blindly followed the hand signals. Moreover, no attempt is made to bring notice to the master that the rule had been violated by failure on the part of the violators to neglect to inform themselves of safety in so doing. It is not likely that those who violated such a salutory and important rule for the protection of lives of employees and passengers would ever report such violation. Dismissal would follow. Had an accident ever occurred by reason of such violation on that yard or elsewhere, followed by investigation, notice of customary violation might be inferred, especially if the master condoned it, thereby relaxing the rule. There is no such evidence. On the other hand, a vast number of those who worked on that yard and operated the trains there, swore they had never in their long experience known of a violation of the rule. Can we say that this rule was so habitually violated, and so frequently and openly and for such a length of time, that the master knew or should have known by reasonable diligence that it was a dead letter? The answer is found in *Southern Ry. Co.* v. *Johnson*, 111 Va. 499, and cases there cited. A verdict based on this meagre evidence of habitual violation and knowledge of defendant thereof, could not stand, wherefore it was

not error to take consideration of that contention from the jury.

If the evidence is such that a verdict, if returned, would be set aside, it is the duty of the court to give a peremptory instruction. *Estep* v. *Price,* 93 W. Va. 81; *Jameson* v. *Ry. Co.,* 97 W. Va. 119. Rules of this character, vital and important for conservation of life and property, are in the nature of laws promulgated for the government of employees and safety in the conduct of the business of carriers, and should not be lightly annulled by the courts, however great the sympathies which may be aroused for the dependents of those who violate them. It is no excuse for one to violate a law or positive rule of conduct and escape its consequences because others have flagrantly violated it and escaped the consequences.

It is also contended that the negligence of the fireman in not observing the derail and warning the deceased caused the accident, and therefore under the Federal Act, even if it was the duty of Hudson to fully inform himself and know that he was protected, he was only guilty of contributory negligence, which would not defeat, but only lessen his recovery under the Federal Act, and *Fox* v. *Lehigh Valley Railroad,* 292 Pa. State Rep. 321, and cases there noted, were cited in conference as controlling. In that case the rule to observe signals did not apply to the travelling fireman who was injured. The federal decisions in cases of this character, where there is a positive duty imposed upon an engineman, hold that he cannot recover on the theory that other members of his crew were also bound to perform that duty and their negligence contributed in a proximate way to the injury by non-performance. *Davis* v. *Kennedy, Adm'r.,* 266 U. S. 147; 69 Law Ed. 212; *Frese, Adm'r.* v. *C. B. & Q. Ry. Co.,* 263 U. S. 1; 68 L. Ed. 131. Many decisions of state courts are in accord. See note to *Davis* v. *Kennedy, supra,* in 69 L. Ed. Supreme Court. The decisions of the Supreme Court of the United States involving the Federal Act are controlling. In the recent case of *Washington B. & A. Elec. Ry. Co.* v. *Cook,* (Md. 1924) 125 Atl. 172, federal and state decisions on this point of error are reviewed, and recovery denied. See also

*Virginian R. Co.* v. *Linkous,* 230 Fed. 88, (certiorari denied thereto in 242 U. S. 630; 61 L. Ed. 537.)

The judgment of the trial court is affirmed.

*Affirmed.*

LIVELY, JUDGE, (On petition for rehearing) :

Whether the trial court instructed for defendant on the ground that plaintiff's intestate's death resulted from his disobeyance of the rules promulgated for his safety in accidents of this character, or whether because the evidence did not sustain the averments of negligence charged in the declaration is not clear. The duties of defendant set out in the declaration are : to employ competent servants and employees; to furnish a safe place to work; to promulgate proper rules and regulations; to prevent defects in its cars, appliances and tracks; and to furnish proper tools and machinery. The declaration then charges that each of these duties was breached; and it is then averred that on July 5, 1926, plaintiff's intestate was in defendant's employ as a locomotive engineer, and while in discharge of his duties at the Auville yard, "the defendant by its servants, agents and employees so negligently conducted itself as that, due to the negligence of the defendant aforesaid, the said locomotive engine on which the plaintiff's decedent was at the time working and employed was derailed, wrecked and thrown from said track and plunged over an embankment", resulting in his death. Declarations in this kind of suit must aver the duty of the defendant, the existence of negligence in its performance or non-performance, and specify the act resulting in damages. It need not detail all the facts evidencing negligence. *Snyder* v. *Wheeling Elec. Co.,* 43 W. Va. 661, 39 L. R. A. 499, 64 Am. St. Rep. 922; *Wills* v. *Coal Co.,* 97 W. Va. 476, 125 S. E. 367; *Pallatto* v. *Cherry River Paper Co.,* 106 W. Va. 60, 144 S. E. 721. No particular act of negligence is charged except the omission to perform the duties above set out. What particular act of negligence on the part of defendant which caused the locomotive to plunge over the embankment can be found in the declaration? If it was caused by reason of the non-performance of the duties charged, then the declaration will

cover it, and the court can consider it; on the other hand, if the act did not arise from the non-performance of the duties charged, a verdict could not stand. The evidence must support the averments of negligence in the declaration in order to sustain a verdict for plaintiff.

It is now argued on petition for rehearing that when Hudson ran by the red block he had eighty to ninety feet before he reached the "bug" or derail, and while he consumed nine seconds if travelling at ten miles per hour, or seven seconds if going at eight miles per hour, the towerman should have removed the bug from the track after Hudson ran by the danger signal. Thus the doctrine of the "last clear chance" is invoked. Whether the evidence of circumstances surrounding the injury is of such probative value to warrant the application of this doctrine, (*McLeod's Adm'r.* v. *Charleston Laundry Co.,* 106 W. Va. 361, 145 S. E. 756), we need not *necessarily* decide. But no one says the towerman saw Hudson pass the red signal board or where he (towerman) was standing at that particular time, or whether he would have had time to throw the "bug" if he did see him pass, or whether it would have been his duty so to do, in view of the passenger train then on the block which might arrive at any moment. Thus we find the doctrine of the last clear chance does not properly arise under the averments of the declaration, nor is it applicable under the evidence.