399 S.E.2d 664

R. Wayne RODGERS, Administrator of the Estate of Hazlett M. Rodgers, Sr.; and R. Wayne Rodgers, Administrator of the Estate of Myrtle L. Rodgers; and R. Wayne Rodgers, in His Own Right; Myrtle Elizabeth Burton; and Bruce T. Rollins

v.

Hazlett M. RODGERS, Jr., John T. Rodgers.

No. 19596.

Supreme Court of Appeals of West Virginia.

Nov. 13, 1990.

---

Victor A. Barone, Charleston, for John T. Rodgers.

Charles D. Bell, Wellsburg, for Hazlett M. Rodgers, Jr.

J.W. Bonie, Weirton, for R. Wayne Rodgers.

MILLER, Justice:

The plaintiff, John T. Rodgers,[1] appeals from an adverse judgment in the Circuit Court of Brooke County as to the ownership of 516 shares of stock in the Wellsburg National Bank. Plaintiff asserted that the stock belonged to the estate of his father, Hazlett M. Rodgers, Sr. The defendant below, Hazlett M. Rodgers, Jr., asserted that the stock was his separate property by virtue of various *inter vivos* gifts from

---

1. The style of this case is somewhat misleading. All of the named parties are heirs-at-law to the estates of Hazlett M. Rodgers, Sr., and his wife, Myrtle L. Rodgers. Suit was initially filed by the administrator and some of the heirs against Hazlett M. Rodgers, Jr., John T. Rodgers, and others for a determination of the ownership of assets which Hazlett M. Rodgers, Jr., the estates' attorney, allegedly had converted to his own use. No relief was sought against John T. Rodg-ers, who subsequently filed a cross-claim against Hazlett M. Rodgers, Jr., on the same grounds. The claims of the named plaintiffs were subsequently dismissed, and the trial court designated John T. Rodgers as the plaintiff. Thus, the only parties remaining in this appeal are John T. Rodgers, to whom we refer as the plaintiff, and Hazlett M. Rodgers, Jr., the defendant below.

his father. The trial court granted a directed verdict in favor of the defendant as to 336 shares of the stock on the ground that the plaintiff's claim to those shares was barred by the statute of limitations. A jury concluded that the remaining 180 shares belonged to the defendant as well. We conclude that the trial court erred in directing the verdict as to the 336 shares of stock and in giving certain instructions at the trial of the ownership of the remaining stock. Consequently, we reverse the judgment of the circuit court and remand for a new trial.

### I.

The salient facts giving rise to this controversy are as follows. In the 1930's, Hazlett M. Rodgers, Sr., began purchasing stock of the Wellsburg National Bank in the names of his then minor children. Over time, he purchased 336 shares of bank stock in the name of the defendant and 180 shares in the name of Mary Rodgers, his daughter.[2] Even though the stock was registered in the children's names, Mr. Rodgers, Sr., either retained possession of the certificates or turned over them to his wife for safe keeping. During his lifetime, Mr. Rodgers, Sr., received the dividends from the bank stock and reported them as income on the joint federal income tax return he filed with his wife. When Mr. Rodgers, Sr., died in 1971, Mrs. Rodgers retained possession of the stock certificates and continued to receive and report on her tax return the income from the stock until her death in 1982. Both Mr. Rodgers, Sr., and his wife died intestate.

The defendant has been a practicing attorney in Brooke County for some thirty-seven years and acted as legal counsel for his parents. He handled virtually all of his parents' business affairs and acted as the attorney for their estates. It was not until September, 1983, however, that an appraisal of his father's estate was filed. The defendant's brother, R. Wayne Rodgers, who had been recently appointed administrator of the estate, refused to approve the

appraisal because it did not include the 516 shares of bank stock.

In January, 1985, this suit was commenced on behalf of the heirs. The complaint alleged that the defendant had converted the stock and other assets to his own use and sought to compel him to return them to his father's estate. The defendant asserted that his father had made an *inter vivos* gift to him of the stock and that it was, therefore, not properly includable in the estate.

Trial of the action commenced on November 30, 1988. At the close of the plaintiff's case-in-chief, the defense moved for a directed verdict, partly on the ground that the plaintiff's claims were barred by the statute of limitations. The trial court granted the motion with respect to the 336 shares of stock initially registered in the name of the defendant, but submitted to the jury the question of the ownership of the remaining 180 shares. On December 1, 1988, the jury returned a verdict in favor of the defendant. By order dated February 15, 1989, the circuit court denied the plaintiff's motion to set aside the verdicts. It is from this order that the plaintiff now appeals.

### II.

█ The first contention on appeal is that the trial court erred in directing a verdict in favor of the defendant with regard to the 336 shares of bank stock originally registered in his name. We have recognized that a verdict should not be directed against a plaintiff in a civil case unless he has failed to demonstrate a *prima facie* right to recover. *Blair v. Preece*, 176 W.Va. 532, 346 S.E.2d 50 (1986). *See Church v. Wesson*, 182 W.Va. 37, 385 S.E.2d 393 (1989); *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 768 (1979); *Jenkins v. Chatterton*, 143 W.Va. 250, 100 S.E.2d 808 (1957). In determining whether a *prima facie* case has been shown, it is incumbent on the trial court to weigh the evidence in the plaintiff's favor, as we stated

---

**2.** Mr. Rodgers, Sr., also purchased bank stock in his wife's name and corporate stocks in the names of his other children. These stocks are not involved in this appeal.

in Syllabus Point 1 of *Jividen v. Legg,* 161 W.Va. 769, 245 S.E.2d 835 (1978):

" ' "Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence. Syllabus, *Nichols v. Raleigh–Wyoming Coal Co.,* 112 W.Va. 85 [163 S.E. 767 (1932) ]" '. Point 1, Syllabus, *Jenkins v. Chatterton,* 143 W.Va. 250 [100 S.E.2d 808] (1957)."

Our duty on appeal was stated in Syllabus Point 1 of *Lindsey v. Bluefield Produce & Provision Co.,* 91 W.Va. 118, 112 S.E. 310 (1922):

"Where there has been a directed verdict for the defendant, and error is assigned for that reason, the appellate court will consider the undisputed facts, and discard all testimony which conflicts with that of plaintiff, in determining whether plaintiff has made a case which should go to the jury."

See *Belcher v. Norfolk & W. Ry. Co.,* 140 W.Va. 848, 87 S.E.2d 616 (1955), *overruled on other grounds, Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979).

The trial court directed the verdict on the ground that the plaintiff's claim to the 336 shares was barred by the statute of limitations. The trial court found that the plain-tiff was aware of the defendant's claim to ownership of the stock as early as 1978 and apparently concluded that because the plaintiff took no action to dispute that claim until 1987, the claim was time barred.[3]

## A.

▮▮▮ The action below bore substantial equitable overtones. As attorney for his father's estate, the defendant stood in the position of a fiduciary. As we explained in Syllabus Point 4 of *Bank of Mill Creek v. Elk Horn Coal Corp.,* 133 W.Va. 639, 57 S.E.2d 736 (1950):

"The relationship of attorney-at-law and client is of the highest fiduciary nature, calling for the utmost good faith and diligence on the part of such attorney." [4]

In such circumstances, the claim would appear to be an equitable one controlled by the doctrine of laches rather than by a statute of limitations. As we stated in Syllabus Point 3 of *Felsenheld v. Bloch Bros. Tobacco Co.,* 119 W.Va. 167, 192 S.E. 545, 123 A.L.R. 334 (1937):

"Statutes of limitations are not applicable in equity to subjects of exclusively equitable cognizance. Matters pertaining to fiduciary relationships come within the rule." [5]

See also *Laurie v. Thomas,* 170 W.Va. 276, 294 S.E.2d 78 (1982); *Patrick v. Stark,* 62 W.Va. 602, 59 S.E. 606 (1907).

3. This litigation was instituted in 1985. The plaintiff did not file his cross-claim until 1987. *See* note 1, *supra.* The trial court did not specify which statute of limitations barred the plaintiff's action or the period in which such suit must be brought.

4. In Syllabus Points 5 and 6 of *Work v. Rogerson,* 152 W.Va. 169, 160 S.E.2d 159 (1968), we summarized the obligation of a fiduciary dealing with property that is involved in the fiduciary relationship:

"5. 'A party holding a fiduciary relation to trust-property cannot become the purchaser of such property, either directly or indirectly; and if he does the sale is voidable and may be set aside at the mere pleasure of the beneficiaries, although the price may have been adequate and the purchaser gained no advantage.' Point 3, Syllabus, *Reilly v. Oglebay,* 25 W.Va. 36 [ (1884) ].

"6. Where a fiduciary while actually holding such relationship acquires interest in property from a sale thereof, such sale is voidable although the fiduciary may have given adequate consideration and gained no advantage whatsoever."
See also *Dillon v. Dillon,* 178 W.Va. 531, 362 S.E.2d 759 (1987).

5. Where the plaintiff is essentially pursuing a legal demand in equity, the court will ordinarily follow the applicable statute of limitations, as stated in Syllabus Point 1 of *Clark v. Gruber,* 74 W.Va. 533, 82 S.E. 338 (1914):

"Where plaintiff's demand is purely a legal one, equity as a general rule follows the law literally in applying the statute of limitations." See also *G.T. Fogle & Co. v. King,* 132 W.Va. 224, 51 S.E.2d 776 (1948); *Crawford's Adm'r v. Turner's Adm'r,* 67 W.Va. 564, 68 S.E. 179 (1910).

It is clear that delay itself in bringing the suit will not bar laches, as we stated in Syllabus Point 1 of *Acker v. Martin*, 136 W.Va. 503, 68 S.E.2d 721 (1951):

" 'Mere delay will not bar relief in equity on the ground of laches. "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." *Bank of Marlinton v. McLaughlin*, 123 W.Va. 608 [17 S.E.2d 213 (1941) ], Pt. 2, syl.' Pt. 2 Syl., *Hoglund v. Curtis*, 134 W.Va. [735, 61 S.E.2d 642 (1950) ]"

*See Kuhn v. Shreeve*, 141 W.Va. 170, 89 S.E.2d 685 (1955); *Pownall v. Cearfoss*, 129 W.Va. 487, 40 S.E.2d 886 (1946). What constitutes laches depends on the peculiar facts of each case. *Hartley v. Ungvari*, 173 W.Va. 583, 318 S.E.2d 634 (1984); *White v. Manchin*, 173 W.Va. 526, 318 S.E.2d 470 (1984); *Hertzog v. Fox*, 141 W.Va. 849, 93 S.E.2d 239 (1956).

Moreover, where a fiduciary relationship exists and claims are made as to property allegedly appropriated by the fiduciary, the defense of laches is not favored. We spoke to this in Syllabus Point 7 of *Work v. Rogerson*, 152 W.Va. 169, 160 S.E.2d 159 (1968):

"Where a fiduciary relationship exists and suits are filed to set aside the sale of property, the defense of laches is not usually regarded with favor and the lapse of time is not considered as important as in other cases, and where facts relied on to set aside such conveyance are concealed laches will not as a rule bar the action in such cases." [6]

*See Bank of Mill Creek v. Elk Horn Coal Corp., supra.*

We note that the rights of beneficiaries or heirs-at-law with regard to claims against a personal representative or other fiduciary who has settled an account are set out in W.Va.Code, 55–2–7 (1972).[7] This statute provides that "a suit to hold such fiduciary or his sureties liable for any balance stated in such account to be in his hands shall be brought within ten years" after the account was confirmed. More importantly, it also states: "The right to recover money paid under fraud or mistake shall be deemed to accrue, both at law and in equity, at the time such fraud or mistake

---

6. In *Work*, former owners of undeveloped coal land brought suit to set aside the sale of the property for delinquent taxes on the ground that the commissioner of school lands had entered into written agreements with the purchasers of the land which gave him an interest in the property. Although the sales had occurred in the 1930's, the written agreements were not recorded until 1945, and the suits to set aside the sales were not filed until 1949. We held the suits not to be barred by laches.

7. W.Va.Code, 55–2–7, provides:

"The right of action upon the bond of an executor, administrator, guardian, curator or committee, or of a sheriff acting as such, shall be deemed to have first accrued as follows: Upon a bond of a guardian or curator of a ward, from the time of the ward's attaining the age of eighteen years, or from the termination of the guardian's or curator's office, whichever shall happen first; and upon the bond of any personal representative of a decedent or committee of an insane person, the right of action of a person obtaining execution against such representative or committee, or to whom payment or delivery of estate in the hands of such representative or committee shall be ordered by a court acting upon his

account, shall be deemed to have first accrued from the return day of such execution, or from the time of the right to require payment or delivery upon such order, whichever shall happen first. And as to any suit against such fiduciary himself, or his representative, which could have been maintained if he had given no bond, there shall be no other limitation than would exist if the preceding section [§ 55–2–6] were not passed. Where any such fiduciary, or any other fiduciary, has settled an account under the provisions of article four [§ 44–4–1 et seq.], chapter forty-four of this Code, a suit to hold such fiduciary or his sureties liable for any balance stated in such account to be in his hands shall be brought within ten years after the account has been confirmed. The right to recover money paid under fraud or mistake shall be deemed to accrue, both at law and in equity, at the time such fraud or mistake is discovered, or by the exercise of due diligence ought to have been discovered."

We recognize that the defendant, although occupying a fiduciary relationship as attorney for the estates of his father and mother, is not one of the fiduciaries described in this section. Nevertheless, his relationship is analogous because he essentially controlled the administration of the estates.

is discovered, or by the exercise of due diligence ought to have been discovered." We have applied a similar rule in equity cases where no statute was involved. *See, e.g., Bank of Mill Creek v. Elk Horn Coal Corp., supra; Trowbridge v. Stone's Adm'r,* 42 W.Va. 454, 26 S.E. 363 (1896). If ten years is an appropriate period in which to bring a suit to compel a distribution of funds from the final accounting by a fiduciary, a like period would not necessarily measure laches where the fiduciary has concealed funds that should have been included in the accounting under the foregoing statute.

■ An analogy may be drawn to *Haudenschilt v. Haudenschilt,* 129 W.Va. 92, 39 S.E.2d 328 (1946), where the plaintiff filed a claim against the estate of his former guardian, whom the plaintiff alleged had failed to account for and turn over funds from the estate of the plaintiff's father. The commissioner rejected the claim on the theory that a 1934 accounting, designated as a final accounting by the guardian, was *res judicata.* The plaintiff subsequently filed a suit in equity to reopen the proceedings by surcharge and falsify.[8] The lower court held the suit was barred under W.Va.Code, 44–4–20 (1923), which made reports of fiduciaries binding and conclusive once they were confirmed by a commissioner.[9] On appeal, this Court rejected this conclusion and held in Syllabus Point 1 of *Haudenschilt* that the stat-

ute did not take away the equity powers of a court:

"Code, 44–4–20 [now W.Va.Code, 44–4–18 (1982)], does not deprive a court of equity of its general jurisdiction to entertain suits to surcharge and falsify the settlement of the accounts of a fiduciary where such settlement is based upon, or procured by, fraud, actual or constructive."

Moreover, the Court went on to hold in Syllabus Point 2 of *Haudenschilt* that the failure to properly account constituted fraud:

"Failure of a guardian to report to a commissioner of accounts, before whom his settlement is pending, all funds received by him as guardian, for which, by law, he is required to account, constitutes fraud against his ward, and a settlement procured through such failure will be set aside by a court of equity in a suit therein, instituted to surcharge and falsify the same."

In order to clarify this concept of constructive fraud, the Court explained:

"But the fact that the guardian had this sum of money in his possession, and failed to account for it, whether intentionally or not, was, in law at the very least, constructive fraud; and such fraud was just as destructive to the interests of plaintiff as if there had been actual fraud." 129 W.Va. at 111, 39 S.E.2d at 328."

---

8. In *Black's Law Dictionary* 1292 (5th ed. 1979), this phrase is defined as follows:
   "*Surcharge and falsify.* This phrase, as used in the courts of chancery, denotes the liberty which these courts will occasionally grant to a plaintiff, who disputes an account which the defendant alleges to be settled, to scrutinize particular items therein without opening the entire account. The showing an item for which credit ought to have been given, but was not, is to surcharge the account; the proving an item to have been inserted wrongly is to falsi[f]y the account."

9. The present day counterpart of this statute, W.Va.Code, 44–4–18 (1982), provides:
   "The report, to the extent to which it may be so confirmed by the county commission, or confirmed on appeal by the circuit court, shall be taken to be correct, and shall be binding and conclusive upon creditors of a

decedent's estate, and binding and conclusive upon every beneficiary of the estate who has had notice that the report has been laid before the fiduciary commissioner for settlement, or upon completion of the report was notified by the fiduciary commissioner of its completion and that the same would remain in his office ten days subject to inspection and exception. Such notices to any creditor or beneficiary who is under disability shall be given by personal service on the guardian or committee of such person. Where the report is that of a guardian, committee or curator, the notice shall be served personally on the infant, ward or beneficiary and on the person or persons having his custody, or upon the guardian ad litem of such infant, ward or beneficiary that may be appointed for the purpose by the county commission."

■ We conclude that where an individual occupies a fiduciary relationship to an estate and claims ownership to estate assets that are not conveyed to such fiduciary by the will or by intestate succession, a beneficiary of such estate cannot be charged with knowledge of such claim until an appraisement of the estate's assets has been filed. It is at this point that the due diligence and the actual notice inquiry begins. · To hold otherwise is to allow the fiduciary not only to delay the administration of the estate to assert laches, but also to claim that he gave unofficial notice of what was in the estate to the beneficiaries. Our cases have stated that a fiduciary of an estate owes a high degree of care to diligently administer an estate. *See, e.g., Tabler v. Weller,* 176 W.Va. 267, 342 S.E.2d 234 (1986); *In Re Estate of Lapinsky v. Sparacino,* 148 W.Va. 38, 132 S.E.2d 765 (1963).

### B.

Taken in the light most favorable to the plaintiff, the evidence shows that he knew for many years that the 336 shares of stock at issue were registered in the name of his brother. He also admitted that there were some conversations within the family, possibly in 1978, with regard to the distribution of the bank stock.

■ It was undisputed, however, that Mr. Rodgers, Sr., retained possession of the stock certificates, collected the dividends for his own use, and declared the income on his tax returns throughout his lifetime. When Mr. Rodgers, Sr., died in 1971, his wife continued this practice until she died in 1982. These actions were not consistent with the defendant's claims of complete ownership prior to the filing of the appraisal. The prerequisites for *inter vivos* gifts are set out in Syllabus Points 2 through 6 of *Tomkies v. Tomkies,* 158 W.Va. 872, 215 S.E.2d 652 (1975):

"2. Where a valid *inter vivos* gift is intended, the donor must be divested of, and the donee invested with the right of property in the subject of the gift. Accordingly, the act of donation must be absolute, irrevocable, and immediate, without any reference to its taking effect at some future period and the donor must deliver the property and part with all present and future dominion over it.

"3. The elements of proof required to sustain an *inter vivos* gift of corporate stock are the same as those required to prove a valid *inter vivos* gift of other personalty.

"4. The mere possession of the subject of an alleged gift, unaccompanied by proof of its delivery by the donor to the donee, is insufficient to establish it as a valid *inter vivos* gift.

"5. The standard of evidence required to establish an *inter vivos* gift must be clear and convincing on every element necessary to constitute the gift.

"6. To sustain a *parol* gift, it must be shown by clear and convincing proof that the donor made delivery and relinquished all dominion and control over the thing delivered, and that the donee accepted the gift."

We need not decide the *inter vivos* gift issue as to the 336 shares of stock. We need only hold that under the foregoing law, the trial court committed reversible error in holding this suit was time barred.

### III.

The other phase of this case involves the 180 shares of bank stock registered in the name of Mary Rodgers. When Mary Rodgers died in 1970, the stock was not listed as an asset of her estate. Testimony revealed that Mr. Rodgers, Sr., received the dividends during his lifetime and kept possession of the shares. According to the defendant, Mary endorsed the stock over to her father, who gave it to the defendant sometime between 1966 and 1971. However, these shares were not registered in the defendant's name until three months after his father's death. Even then, the certificates were held and the dividends were collected by Mrs. Rodgers.

The court submitted the question of the ownership of the 180 shares to the jury, who returned a verdict in favor of the

defendant. The plaintiff assigns several errors with regard to the jury instructions.

## A.

■ The first instruction concerned delivery of a gift of personal property. Over objection, the trial court gave an unnumbered instruction which stated that a gift could be made "with the right of enjoyment in the donee postponed until the death of the giver, if the property is delivered to a third person with instructions to deliver it upon the giver's death." [10] This language is contrary to our statement in Syllabus Point 6 of *Tomkies*, requiring proof that "the donor made delivery and relinquished all dominion and control over the thing delivered, *and that the donee accepted the gift.*" (Emphasis added).

■ In *Dickeschied v. Exchange Bank*, 28 W.Va. 340 (1886), we implicitly recognized that delivery of a gift to an agent who accepts the gift on behalf of the donee could satisfy the requirements of a valid gift. However, we also held in Syllabus Points 8 and 9 of *Dickeschied* that if the third party is not the agent of the donee, a valid gift can be accomplished only if such third party delivers the gift to the donee during the donor's lifetime:

"8. If the subject of a gift be delivered by the donor to a third person with authority to deliver it to the donee, such third person, until the authority is executed by an actual delivery to, and acceptance by the donee, is the agent of the donor, who, until such actual delivery is made, may revoke the authority and take back the gift.

"9. If such actual delivery to the donee [does] not take place during the lifetime of the donor, the authority of such third person to deliver the gift is revoked by the donor's death; the property does not pass to the donee but remains in the donor, and goes to his executor or administrator."

*See also E.M. Meadows Funeral Home v. Hinton*, 119 W.Va. 609, 195 S.E. 346 (1938). *See generally* Annot., 57 A.L.R.3d 1083 (1974). These principles are consistent with the first sentence of W.Va.Code, 36–1–5 (1923), which governs gifts of personal property and provides: "No gifts of any goods or chattels shall be valid unless made by writing, signed by the donor or his agent, or by will, or unless actual possession shall have come to and remained with the donee or some person holding for or under him." [11]

The unnumbered instruction given by the trial court failed to inform the jury that the third party to whom delivery was made had to be an agent for the *donee* rather than the *donor.* In this respect, the instruction was erroneous.

## B.

■ Complaint is also lodged against Defendant's Instruction No. 7, which was offered in conjunction with the defendant's claim that his father gave him the 180 shares of bank stock. The instruction stated that the "mere fact that the parents received the income from the 180 shares ... does not prove that a gift was not made." [12] This is not an accurate state-

---

10. The complete instruction reads as follows:
"The Court also instructs the jury that the owner of personal property may make a valid gift with the right of enjoyment in the donee postponed until the death of the giver, if the property is delivered to a third person with instructions to deliver it upon the giver's death, provided the giver parts with all control and has no right of recall over it."

11. The remaining text of W.Va.Code, 36–1–5, states:
"If the donor and donee reside together at the time of the gift, possession at the place of their residence shall not be a sufficient possession within the meaning of this section. The requirements of this section shall not apply to the wife's paraphernalia. No seal shall be necessary to give validity to a gift of goods or chattels by writing, as hereinbefore provided."

12. The full text of Defendant's Instruction No. 7 was:
"The Court further instructs the jury that the mere fact that the parents received the income from the 180 shares of Wellsburg Bank stock does not prove that a gift was not made and therefore does not negate, in and of itself, the gift if you find the 180 shares were delivered by the Father to Hazlett M. Rodgers, Jr. But [you] may consider this evidence in deciding this issue of gift."

ment of the law under the facts of this case.

As we have previously pointed out in Syllabus Point 6 of *Tomkies, supra,* where a parol gift is claimed, the donor must have "made delivery and relinquished all dominion and control over the thing delivered." Certainly, the parents' retention of the dividends from the stock in the name of Mary Rodgers at the time of the purported delivery would be inconsistent with an *inter vivos* gift of the stock to the defendant. This instruction is misleading because it initially informs the jury that the retention of the income by the parent does not itself negate the gift if the jury find the 180 shares were delivered by Mr. Rodgers, Sr., to the defendant. The central issue was whether a gift had been made. This issue could not be resolved merely by determining whether the shares had been delivered as the instruction suggested. The retention of the income by the parents after the delivery was made would be contrary to the definition of an *inter vivos* gift set forth in *Tomkies.* Under *Tomkies,* the retention of the income would be a factor against a bona fide *inter vivos* gift.

### C.

█ The plaintiff also challenges Defendant's Instruction No. 3, which advised the jury that if they found a pattern or plan in Mr. Rodgers, Sr.'s acts of giving bank stock to the defendant, they could also presume that this pattern or plan continued throughout his life. The instruction also went on to state that the jury could consider the presumption of the pattern of action in determining whether Mr. Rodgers, Sr., made a gift of the 180 shares to the defendant.[13] Although the instruction did not use the term, it is clear from the discussion at trial that the parties and the court understood it to embrace the concept of "habit" under Rule 406 of the West Virginia Rules of Evidence.

Rule 406 permits the introduction of "[e]vidence of the habit of a person ... whether corroborated or not and regardless of the presence of eyewitnesses ... to prove that the conduct of the person ... on a particular occasion was in conformity with the habit[.]"[14] In several cases prior to the adoption of Rule 406, we discussed evidence of habit, but did not attempt to pronounce any general rule. *See Hudson v. Norfolk & W. Ry. Co.,* 106 W.Va. 437, 146 S.E. 525 (1928), *cert. denied,* 279 U.S. 866, 49 S.Ct. 481, 73 L.Ed. 1004 (1929); *Casdorph v. Hines,* 89 W.Va. 448, 109 S.E. 774 (1921); *Bank of Greenville v. S.T. Lowry & Co.,* 81 W.Va. 578, 94 S.E. 985 (1918); *Hartman v. Evans,* 38 W.Va. 669, 18 S.E. 810 (1893). *Cf. Bowman v. Barnes,* 168 W.Va. 111, 282 S.E.2d 613 (1981); *Yeater v. Jennings Oil Co.,* 75 W.Va. 346, 84 S.E. 904 (1914).[15] *See generally* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6.4 (1986).

█ It is generally agreed that in order to be admissible under Rule 406, evidence of a person's habit must be shown to be a

**13.** The text of Defendant's Instruction No. 3 reads:

"The Court further instructs the jury that if they find, from a clear and convincing preponderance of the evidence, the existence of a plan or a pattern of action by Hazlett M. Rodgers, Sr., whereby stock in the Wellsburg National Bank was periodically given by him to Hazlett M. Rodgers, Jr., then [you] may find a presumption that the pattern of action continued throughout his life and with respect to the 180 shares of Wellsburg National Bank stock, now in the name of Hazlett M. Rodgers, Jr., and you may consider the presumption of the pattern of action in determining whether Hazlett M. Rodgers, Sr., made a gift of the 180 shares to Hazlett M. Rodgers, Jr."

**14.** The complete text of W.Va.R.Evid. 406 is:

"Habit; Routine Practice. Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

Besides covering the habits of a person, this rule covers the routine practices of an organization. E. Cleary, *McCormick on Evidence* § 195 (3d ed. 1984).

**15.** Both *Bowman v. Barnes, supra,* and *Yeater v. Jennings Oil Co., supra,* indicate a person's work habits can be considered in assessing damages for loss of earning capacity. This is somewhat different from proof of a specific habit to establish that a party acted in accordance with it.

regularly repeated response to similar factual situations.[16] The trustworthiness of habit evidence lies in its regularity, so that the act or response is shown to be almost semiautomatic.[17] *See Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494 (4th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978); *Whittemore v. Lockheed Aircraft Corp.,* 65 Cal. App.2d 737, 151 P.2d 670 (1944); *Fissette v. Boston & Maine R.R.,* 98 N.H. 136, 96 A.2d 303 (1953); *Halloran v. Virginia Chems., Inc.,* 41 N.Y.2d 386, 393 N.Y.S.2d 341, 361 N.E.2d 991 (1977); *Glatt v. Feist,* 156 N.W.2d 819, 28 A.L.R.3d 1278 (N.D.1968); *Charmley v. Lewis,* 302 Or. 324, 729 P.2d 567, 64 A.L.R.4th 549 (1986); *Bown v. City of Tacoma,* 175 Wash. 414, 27 P.2d 711 (1933); *French v. Sorano,* 74 Wis.2d 460, 247 N.W.2d 182 (1976). *See generally* Annot., 64 A.L.R.4th 567 (1988).

Courts are divided as to how many prior instances of identical behavior must be shown in order to demonstrate a habit. *See* Annot., 64 A.L.R.4th § 27 at 598–601. It is probably not possible to prescribe a precise number because much depends on the nature of the behavior in question.[18] We decline, however, to follow the Wisconsin view that the rule does not require any minimum number. *French v. Sorano, supra; Chomicki v. Wittekind,* 128 Wis.2d 188, 381 N.W.2d 561 (App.1985).

■ Some courts have limited evidence of habit where there are no eyewitnesses to the event which is the subject of habit testimony. If there are eyewitnesses, then habit testimony is not available. *E.g., Gardner v. Geraghty,* 98 Ill.App.3d 10, 53 Ill.Dec. 517, 423 N.E.2d 1321 (1981); *Missouri–Kansas–Texas R.R. Co. v. McFerrin,* 156 Tex. 69, 291 S.W.2d 931 (1956). *See Glatt v. Feist, supra.* Our Rule 406 specifically permits habit testimony "whether corroborated or not and regardless of the presence of eyewitnesses."[19]

■ Finally, as other courts have held, before being admitted, habit evidence is subject to the balancing test contained in Rule 403 to determine whether the probative value of the evidence is substantially outweighed by "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentment of cumulative evidence." *E.g., Utility Control Corp. v. Prince William Constr. Co., Inc.,* 558 F.2d 716 (4th Cir.1977); *Bloskas v. Murray,* 646 P.2d 907, 42 A.L.R.4th 527 (Colo.1982). *See also Farnsworth v. Steiner,* 601 P.2d 266 (Alaska 1979); *Breimon v. General Motors Co.,* 8 Wash.App. 747, 509 P.2d 398 (1973).

From the foregoing general discussion, we do not find that Defendant's Instruction No. 7 was proper. The effect of this instruction was to reduce the complex issue of the elements necessary to demonstrate a valid *inter vivos* gift to a simple question: Was stock in the Wellsburg National Bank periodically given to the defendant by his father? The jury was informed that if this question was answered in the affirmative, there was a presumption that this habit or pattern continued through the lifetime of Mr. Rodgers, Sr. Moreover, the instruction assumed the defendant's possession of the stock. It did not advise, as required by *Tomkies,* that there could be no retention of ownership indicia.

---

**16.** *McCormick on Evidence* § 195 at 575 summarizes:

"A habit ... is the person's regular practice of responding to a particular kind of situation with a specific type of conduct. Thus, a person may be in the habit of bounding down a certain stairway two or three steps at a time, of patronizing a particular pub after each day's work, or of driving his automobile without using a seatbelt." (Footnotes omitted).

**17.** 2 J. Wigmore, *Evidence* § 376 (Chadbourn rev. 1979) (stressing that habit conduct "(a) ... should be numerous enough to base an infer-

ence of systematic conduct, and (b) ... should have occurred under substantially similar circumstances, so as to be naturally suggestive of a system, rather than causal recurrences.")

**18.** In this case, the plaintiff does not raise the issue and, therefore, we do not address it within the facts of this case.

**19.** At common law, some courts required corroborating evidence showing that the habit in question was followed on the particular occasion involved at trial. 1A J. Wigmore, *Evidence* § 98 (Tillers rev. 1983).

The instruction did not limit the jury to consideration of some specific act of Mr. Rodgers, Sr., such as his past practice of purchasing stock and putting it in the names of his children, as illustrative of what he did with Mary Rodgers's shares. Rather, it sought to bypass the critical issue of whether a valid *inter vivos* gift had been made by focusing on the fact that Mr. Rodgers, Sr., had "given" bank stock to his son in the past. That fact, if proven, could not satisfy the necessary elements of an *inter vivos* gift set out in *Tomkies, supra.* We find this instruction to be erroneous.

### D.

Finally, the plaintiff objected to the trial court's amendment of Plaintiff's Instruction No. 25.[20] This instruction was patterned after Syllabus Point 3 of *Pine & Cypress Manufacturing Co. v. American Engineering & Construction Co.,* 97 W.Va. 471, 125 S.E. 375 (1924), in which we pointed out that a person who is charged with conversion of property need not be shown to have acted in bad faith or to have been negligent:

> "Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recover irrespective of good or bad faith, care or negligence, knowledge or ignorance."

We recently reaffirmed this Syllabus Point in *Miami Coal Co., Inc. v. Hudson,* 175 W.Va. 153, 160, 332 S.E.2d 114, 121 (1985).

The trial court deleted from Plaintiff's Instruction No. 25 the phrase "irrespective of good or bad faith, care or negligence, knowledge or ignorance." In *Wholesale Coal Co. v. Price Hill Colliery Co.,* 98 W.Va. 438, 128 S.E. 313 (1925), we made it clear that this phrase referred to the intentions, actions, or knowledge of the *defendant.* This is the general rule elsewhere. *See* 18 Am.Jur.2d *Conversion* § 3 (1985).

We believe the deleted phrase was an essential part of an instruction on the elements of conversion. The omission of this phrase was error because it suggested that the defendant had to be guilty of some bad faith or wrongful intent before the plaintiff could recover. Indeed, this erroneous impression of the law figured in the closing argument of defense counsel, who equated conversion with theft. This completely misperceives the nature of a civil action for conversion, which is essentially the exercise of dominion over the personal property of another by a person who has no legal right to do so. The term "no legal right" is equated to a wrongful exercise of dominion. Bad faith or evil motive is not required.

### E.

In sum, then, each of the instructions complained of contained an incomplete or incorrect statement of the law applicable in this case. Instructions which are incomplete or incorrect are erroneous. *E.g., McGlone v. Superior Trucking Co., Inc.,* 178 W.Va. 659, 363 S.E.2d 736 (1987); *McAllister v. Weirton Hosp. Co.,* 75 W.Va. 173, 312 S.E.2d 738 (1983); *Sydenstricker v. Vannoy,* 151 W.Va. 177, 150 S.E.2d 905 (1966); *Wilson v. Edwards,* 138 W.Va. 613, 77 S.E.2d 164 (1953). In Syllabus Point 5 of *Yates v. Mancari,* 153 W.Va. 350, 168 S.E.2d 746 (1969), we stated:

> " 'An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction.' Point 2, syllabus, *Hollen v. Linger,* 151 W.Va. 255 [151 S.E.2d 330 (1966) ]."

---

**20.** Plaintiff's Instruction No. 25, as amended, reads as follows:
"The Court instructs the jury that if it believes that Hazlett M. Rodgers, Jr. wrongfully or improperly exercised control over the property of Hazlett M. Rodgers, Sr. and/or Myrtle L. Rodgers, or their respective estates, in denial of their rights, or inconsistent therewith; then the conduct of Hazlett M. Rodgers, Jr., amounts to conversion and John T. Rodgers is entitled to recover."

*See Birch v. Kelly,* 177 W.Va. 564, 355 S.E.2d 57 (1987); *Kendall v. Allen,* 148 W.Va. 666, 137 S.E.2d 250 (1964); *Overton v. Fields,* 145 W.Va. 797, 117 S.E.2d 598 (1960). In Syllabus Point 5 of *Sydenstricker v. Vannoy, supra,* we stated:

> "It is reversible error to give an instruction which tends to mislead and confuse the jury."

There is nothing in the record to indicate that the verdict below was not based, at least in part, on the erroneous instructions. Consequently, we must reverse and remand for a new trial on this issue as well. *See Steinbrecher v. Jones,* 151 W.Va. 462, 153 S.E.2d 295 (1967); *Sydenstricker v. Vannoy, supra.*

### IV.

For the foregoing reasons, the judgment of the Circuit Court of Brooke County is reversed, and the case is remanded for a new trial.

Reversed and remanded.